# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

| | | |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 12-00476-TLM** |
| **RULON LEE TOLMAN,** | ) | |
| | ) | **Chapter 13** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **MARY LEONA HUSKEY,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 12-06022-TLM** |
| | ) | |
| **RULON LEE TOLMAN,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

On March 7, 2012, Rulon Lee Tolman ("Debtor") filed a chapter 13[1]

voluntary petition.[2]  On April 12, 2012, Mary Leona Huskey ("Plaintiff") filed a

complaint initiating this adversary proceeding.  Plaintiff seeks a determination that

_____

[1]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title
11 U.S. Code §§ 101-1532, and all rule references are to the Federal Rules of Bankruptcy
Procedure.  This Court has jurisdiction pursuant to 28 U.S.C. § 1334, and all issues before it are
core matters on which it may enter final decisions under 28 U.S.C. § 157.

[2]  Debtor has not confirmed a chapter 13 plan.  Debtor filed an amended plan on
November 21, 2012, but did not notice the same for hearing.  Trustee has filed a recommendation
opposing confirmation.

MEMORANDUM OF DECISION - 1

Debtor owes her a debt that is nondischargeable under §§ 523(a)(2)(A), (a)(4) and (a)(19).[3]  She also asserted claims under the Idaho Consumer Protection Act but, during the course of the litigation, abandoned those claims.  In addition, she dismissed the § 523(a)(19) cause without prejudice.[4]  The remaining causes under § 523(a)(2)(A) and (a)(4) were tried, and written closing arguments filed.  The Court has carefully evaluated all the evidence, and the arguments of the parties. This Decision constitutes the Court's findings and conclusions under Rule 7052.

## BACKGROUND AND FACTS

### A.    The Plaintiff

Mary Huskey was born in 1921 and, at the time of trial, she was 91 years old.  Notwithstanding her age, Plaintiff appeared cogent, aware and percipient. She had a sharp recall of many events.  Understandably, her recall of some matters was on occasion a little vague, however those occasions were few.  She was a competent and credible witness.

Plaintiff had a year of business school education, and worked for some 18

---

[3]  Under § 1328(a)(2), a chapter 13 discharge will not discharge debts "of the kind specified in section 507(a)(8)(C) or in paragraph (1)(B), (1)(C), (2), (3), (4), (5), (8) or (9) of section 523(a)" of the Code.

[4]  In addition to the fact that § 523(a)(19) is not ripe in the context of a chapter 13 filing absent a debtor's request for a hardship discharge under § 1328(b), this Court has decided that a § 523(a)(19) claim cannot effectively be asserted in this Court unless reduced to a "judgment, order, consent order, or decree" in a federal or state judicial or administrative proceeding, "before, on, or after" the petition date.  *Ellsworth v. Anderson (In re Anderson)*, 2012 WL 3133827 (Bankr. D. Idaho Aug. 1, 2012) (addressing § 523(a)(19)(B)).  No such liability determination has yet been rendered in a non-bankruptcy forum.

MEMORANDUM OF DECISION - 2

years as a claims examiner, and then another 10 years as an office worker and receptionist in a medical practice. She had similar sorts of occupations over the balance of her working career. She finished that career with almost 13 years as an administrative secretary for the Idaho Board of Engineers, retiring in 1988.

Given the matters at issue in this litigation, she was questioned about her investment experience. She had little, relying primarily on very traditional and conservative financial products such as certificates of deposit. After her retirement and up to the time her sister passed away in 2006 whn she inherited the sizeable sums underlying the present litigation, Plaintiff relied on Social Security payments of $1,279.00 per month and a State of Idaho pension of $559.00 per month for her retirement needs. She also had some CD's and a little stock.

Plaintiff did not have any appreciable investing experience or acumen. She therefore had to rely on the advice and recommendations of others. Plaintiff did not evidence any meaningful understanding of the details of the documents at issue in this litigation, or the complexities of the financial products and investments those documents represented.

She signed and initialed documents, but she admitted she did not read them in detail and, at times, not at all. She relied instead on the explanations and information Debtor provided her about these documents and the investments she made thereunder.

MEMORANDUM OF DECISION - 3

### B.    The Debtor

Rulon Tolman is an independent life insurance agent, with 34 years of experience in that industry.  He attended two colleges over the course of three years but did not obtain a degree.  He has taken life insurance training and similar continuing education courses throughout his career.

Debtor initially was a captive agent for Mutual of New York ("MONY"), but then he became an independent agent.  While at MONY, he held a Series 6 license.[5]  He no longer holds that license, testifying that he "made the decision [he] didn't want to deal with products that had any risk."

Debtor characterized himself as a "financial professional" for Plaintiff from 2006 through 2010.  He conceded that all Plaintiff's investments during that time were made on his advice and information.  To his knowledge, Plaintiff had no other financial or investment advisor during that time.  On certain of the documents involving Plaintiff's investments, Debtor signed as "investment advisor" or as "financial consultant."[6]

Factual aspects about how Debtor came to know of certain investments and

---

[5]  FINRA (Financial Industry Regulatory Authority) Series 6 licenses, acquired after successful examination, entitle the holder to sell mutual funds and variable annuities, but not corporate or municipal securities.

[6]  Idaho Code § 30-14-403 requires "investment advisers" to be registered with the State unless falling within certain exceptions, and makes unlawful the transaction of business within the State by unregistered investment advisers.  There was no evidence that Debtor was so registered.

MEMORANDUM OF DECISION - 4

products, and the extent or degree of his investigation or evaluation of the same, will be addressed later in this Decision.

### C.    Transactions

Plaintiff first met Debtor in 1997. Debtor was a financial consultant for, and had sold annuities to, Plaintiff's sister Erma Travis and Erma's husband. Erma's husband passed away in 1997, and Plaintiff met Debtor while he was assisting Erma with her affairs. Erma was later diagnosed with a terminal illness. Erma met with Debtor and asked him to help Plaintiff as he had Erma and her husband, because Plaintiff would be Erma's heir.

Erma passed away in June 2006. Plaintiff was the sole beneficiary of certain annuities Erma owned that were purchased through Debtor. Those annuities had a value in excess of $900,000.

At the time of her sister's passing, Plaintiff was almost 85 years old. She had been retired for eighteen years, and had lived off her Social Security income and state pension payment. She had accumulated some savings, but she was not prepared to deal with her sizeable inheritance without assistance.

In August 2006, shortly after Erma's death, Plaintiff met with Debtor. She liked and trusted him, and she knew she needed professional assistance to deal with her inheritance. She then and later, without exception, followed his recommendations and advice. At trial, Debtor confirmed that he understood at the

MEMORANDUM OF DECISION - 5

time he assisted Plaintiff she had little prior experience with investments, and that

her income was limited to Social Security and pension payments.[7]

### 1.     2006 annuities

Plaintiff had options for the $900,000+ in inherited annuities.  She could

have surrendered them for a lump sum payment, elected to take an income stream,

or transferred them to another annuity.  The decision had to be accomplished

within five years or the annuity company would disburse a lump sum payment.

Debtor advised her to purchase new annuities in her name, purportedly in order to

improve the rate of return on her investments.[8]  She agreed.  Three investments

were made from late August to early October 2006.

First, Debtor recommended, and Plaintiff purchased, a $70,000 Sun Life

Financial annuity.  Exs. 114, 117, 203.

Second, Plaintiff also followed Debtor's advice, and purchased a $425,000

Allianz Annuity.  Ex. 109.  Plaintiff wrote two checks totaling $500,000 made

payable to Allianz for this annuity, and the application indicates that $500,000 was

submitted.  Ex. 110.  Yet Allianz issued the annuity with a stated initial premium

of $425,000.  Exs. 109.  There is no explanation in the documentary evidence, nor

---

[7]  Plaintiff had purchased an annuity through Debtor in 2004.  *See* Ex. 108.

[8]  Neither Debtor nor Plaintiff presented clear evidence to establish what return(s) would
have been received on Erma's annuities and what would be expected on the three annuities
Debtor had Plaintiff purchase after surrendering those she inherited from Erma.

MEMORANDUM OF DECISION - 6

in testimony, as to what happened to the other $75,000.[9]

Third, Debtor advised Plaintiff to purchase an annuity from Americom Life and Annuity Company, which advice she followed, purchasing such an annuity in the amount of $470,321.  *See* Exs. 206, 115, 116.  Again Debtor handled all the paperwork.[10]

Debtor received commissions for selling these annuities to Debtor. Plaintiff indicated she understood Debtor would get a commission, but she did not inquire about it because "it wasn't her business."  Debtor testified that the commissions were paid by the insurance company providing the annuity.  There is no affirmative evidence as to the amount of commissions Debtor received on these three transactions.

## 2.    2008 life settlement contract

Almost two years later, Debtor was contacted by a field marketing organization, Alternative Investment Services ("AIS").[11]  Through AIS, Debtor

---

[9]  Plaintiff clearly relied on Debtor to address the details of the applications and investments.  He transmitted the application materials and funds, and received the contracts. However, there was no evidence as to when Debtor realized there was a discrepancy, and Debtor testified that he did not know what happened to the other $75,000.

[10]  Debtor at trial estimated Plaintiff inherited approximately $900,000 in annuities. However these transactions demonstrate Plaintiff purchased annuities of $965,321 (and actually expended another unaccounted for $75,000) through and with Debtor's assistance, after her sister's death.  The funds she transferred total $1,040,321.

[11]  Debtor testified that, generally, he relied on field marketing organizations to inform him about the products available to sell to his clients.

MEMORANDUM OF DECISION - 7

learned of Consolidated Wealth Holdings ("CWH").  CWH sold "life settlement contracts" or what are sometimes characterized as "viatical" agreements or settlements.

### a.    Viatical agreements

#### i.    Generally

Viatical or life settlement agreements generally involve an insured who wishes to sell his life insurance policy, needing present cash more than the security of a death benefit.  The insured contacts a viatical settlement brokerage firm, and provides relevant information about the policy and his or her medical situation. The insured will generally be paid an amount steeply discounted from the face value of the policy.  The brokerage then offers the life insurance benefit of the policy, or a fractional interest therein, to potential investors.  The decision of an investor to acquire the policy (or an interest in it) depends on the amount required for the purchase, and the amount of that investor's prospective recovery of policy benefits on the insured's death.  Obviously, this return is highly dependent on the expected or projected time of the insured's death.  While potential returns might be high, depending on the cost of acquisition and the ultimate payment of benefit, there is significant risk due to maturity uncertainty.  The investments are also generally illiquid.  Some may have high transactional costs.  They are invariably complex and, as an investment tool, inherently imprecise.

MEMORANDUM OF DECISION - 8

### ii.    Securities regulation

Plaintiff called and examined Joel Server, a registered securities administrator and financial consultant with KMS Financial in Seattle, Washington, about the investment products involved in this litigation.[12]  Server explained many of the fundamental concepts involved with life settlement and viatical contracts.[13]  He testified that such investments are so complicated he has rarely if ever seen them fit an investor's needs.  He also indicated it was highly unlikely they would be appropriate for elderly investors such as Plaintiff.

Server also testified that such contracts are "securities" in Idaho and an individual selling the same is required to hold a securities license as well as an insurance license.  In fact, the Idaho statute expressly defines "securities" as including viatical settlements, life settlements, and similar agreements.  Idaho Code § 30-14-102(28)(e).[14]  As noted, Debtor neither held nor holds a securities license.

---

[12]   Server was qualified as an expert by his education and experience, and the Court finds that his testimony meets the requirements of Fed. R. Evid. 702-705.  *See generally In re Smitty Inv. Grp., LLC*, 2008 WL 2095523 at *7-10 (Bankr. D. Idaho May 16, 2008).

[13]   For example, Server explained the conceptual distinctions between the two terms: life settlement contracts and viatical agreements.  He also noted that these products differed on how future premiums would be funded, which are of course required in order for the policy to remain in effect until the insured's death.

[14]   The Idaho Legislature also later enacted comprehensive statutory provisions dealing with this subject.  *See* Idaho Code §§ 41-1950 to 41-1965 (2009) (the "Life Settlements Act").

MEMORANDUM OF DECISION - 9

### b. Debtor's knowledge and investigation

Debtor received most of his information about viaticals and life settlement contracts and about the companies involved from AIS, though he did get some information directly from CWH.[15]  Debtor had no contract or agreement with AIS. But he did enter into an "appointment" with CWH to sell their products.[16]

At trial, Debtor could not cogently explain the appropriateness of a life settlement contract for Plaintiff.  However, Debtor emphasized the CWH life insurance-related products were "reinsured."  That meant, he said, that another company, here Provident Capital Indemnity ("PCI"), would pay on the insurance policy underlying the CWH contract on a date certain if the insured had not passed away by such date.  By having another company "reinsure" the life settlement contract, Debtor believed there was no risk involved in the CWH investment he promoted to Plaintiff.

But to determine the effectiveness of this hedge against risk, Debtor did not talk with anyone at PCI, nor did he investigate beyond "some research" on PCI in which he determined that PCI had a reported "B+" rating.

With only this background, Debtor "presented" the life settlement contract application to Plaintiff, in order to "show her the advantages of the product."  He

---

[15]  According to Debtor, someone at CWH later told him that AIS "went under."

[16]  Debtor testified this appointment agreement was in writing, but inexplicably he did not have a copy.

MEMORANDUM OF DECISION - 10

did so despite the fact that less than two years earlier Plaintiff's funds had been committed to annuities purchased based on Debtor's advice and assistance.[17]

Plaintiff testified Debtor asked her whether she would be uncomfortable investing "on someone's life" through such a vehicle. He also asked her if she would need her money for 6 years, because it could not be guaranteed to be available until 2014. Debtor further advised her that, at maturity, the return would be two times the amount she invested.[18] At trial, Debtor conceded Plaintiff "probably did not" need such a high return on her investment.[19] Notwithstanding her lack of need, Plaintiff did not demur; she followed Debtor's recommendations. As she confirmed at trial, she always followed Debtor's recommendations.

Trusting Debtor's judgment and advice, Plaintiff agreed to purchase the CWH product. Debtor presented Plaintiff with the CWH initial application materials and disclosures. *See* Exs. 207, 208. The application sought a fractional interest in a policy to be obtained by CWH as Plaintiff's agent, subject to PCI

---

[17] The Allianz annuity had a 10-year term. Ex. 109. The Sun Life annuity had a 10-year term as well. Ex. 114, 117. The Americom annuity had a 12-year surrender schedule. Exs. 115, 206.

[18] Server testified generally about the nature and high degree of risk in life settlement contracts or viaticals. That testimony casts serious doubt on anyone's ability to forecast with precision the extent of return, much less the ability to represent a doubling of investment. Debtor obviously placed great reliance on the commitment of PCI to pay on the policy in May, 2014, if the insured had not passed away by then, when making such assertions.

[19] Not only are there issues with Plaintiff's age, her needs, and her other resources including those obtained through purchases with Debtor, the evidence also indicates Plaintiff has no heirs, and her plan was to distribute her net estate on her death to a charity.

MEMORANDUM OF DECISION - 11

reinsurance, that had an insured with a life expectancy of less than four and a half

years and that would return an annual compound yield of not less than 15%, in

return for which Plaintiff would deposit $400,000 with an escrow agent for the

purposes of acquiring the same.

   The disclosures were numerous. As Plaintiff met with Debtor, he asked her

to, and she did, initial several areas in these disclosures. Plaintiff signed the

disclosures and the application, indicating she would invest $400,000 in a

qualified life settlement contract. The disclosures included mention of the illiquid

nature of the investment, and the lack of predictability of an insured's life

expectancy. They also noted a potential risk if the reinsurer were to go out of

business, and in connection with this, they mentioned that PCI "is involved in

litigation and/or administrative proceedings in Texas."[20]

   Plaintiff also initialed an acknowledgment that she had sufficient

experience in financial, investment and business matters so as to be capable of

assessing the merits and risks of the investment "including any risk associated with

PCI or any reinsurance company." This was not accurate. Another problem is that

the disclosures included verification that the investor had the opportunity to read

and review the contract documents. But Debtor did not receive the contract

---

   [20] Debtor testified that, while he read that page of the application, he did not see the
disclosure that PCI was involved in litigation and was unaware of that fact when presenting the
product to Plaintiff.

MEMORANDUM OF DECISION - 12

documents and present them to Plaintiff until two months after Plaintiff signed the

initial disclosures.  Ex. 209.

The form of that contract established a line of credit from Plaintiff to CWH

for the purposes of acquiring the interest in the underlying Metropolitan Life

("MetLife") insurance policy.[21]  The line of credit is in the amount of $893,450.[22]

The initial draw authorized on the line of credit was $400,000.[23]  CWH's note is

"collateralized" by a 6.3186% interest in a specifically described life insurance

policy issued by MetLife.  However, the note is specifically nonrecourse as to

CWH, and thus can be collected solely from the "proceeds of the collateral."

Neither Plaintiff nor Debtor had any idea this was how the transaction would be

structured.

This was the first life settlement contract Debtor sold, and he had not seen

the documents before selling the product to Plaintiff.  While it is clear Debtor had

more knowledge than Plaintiff regarding life settlement contracts generally, the

---

[21]   Debtor never obtained a copy of, nor verified any of the information or terms
regarding, the MetLife policy referenced in the contract.

[22]   Debtor says he contacted CWH (though whether before or after the contract was
signed is not clear) and was advised that this maximum line of credit amount was meant to reflect
the anticipated return to Plaintiff at the end of the agreement.

[23]   Under the contract this initial "draw" (*i.e.*, the $400,000 Plaintiff paid) is released to
CWH to (1) purchase the policy interest, (2) pay reinsurance premiums, and/or (3) pay policy
premiums for the life of the reinsurance.  Any "excess" is released to CWH to "cover its fees and
costs related to this transaction."  None of these several amounts is itemized.  The contract
(characterizing CWH's obligation as a "note") indicated that future "draws" on the line of credit
"are not anticipated, but are authorized[.]"

MEMORANDUM OF DECISION - 13

extent of his knowledge concerning the CWH contract and the application appears

to have come solely from conversations with CWH and AIS. The exact extent of

his knowledge was not established at trial but was clearly minimal.[24]

Debtor testified he was entitled to receive a 5% commission on the sale of

CWH products. He did not specify the amount received on the sale of the CWH

product to Plaintiff, though it would presumably be $20,000 (5% of $400,000).

Debtor did admit that he received $40,599 in "total" commissions from the sale of

CWH products. But no other specific sales of CWH products were discussed.

Thus, it is not clear exactly how much Debtor received on the sale of the life

settlement contract to Plaintiff.

Plaintiff had to cash in $430,000 worth of her recently-purchased annuities

in order to purchase this CWH product. In doing so, she incurred surrender

penalties, and she also realized a taxable gain for the year.[25] Debtor was aware

that penalties and taxable gains would occur and testified he and Plaintiff "made

---

[24] Debtor's understanding of the CWH contract, and thus his representation to Plaintiff, was simply that she would invest $400,000 and in return receive at the earlier of the insured's death or May, 2014, the amount of $893,450, which was the "doubling" of her investment. Exhibit 101 is a letter to Plaintiff from CWH that accompanied the actual contract documents and appears to support his representations to Plaintiff. It indicated that $400,000 was her "principal investment," that she had a 6.3186% interest in a particular MetLife policy with a face value of $14,140,000 and that the "maturity value" was $893,450 (which amount is, in fact, 6.3186% of $14,140,000).

[25] She surrendered $160,000 worth of her Allianz annuity, suffering a $26,511 "surrender charge" and a taxable gain of $67,171. Exs. 111, 124, 224. She surrendered $210,000 of an OM Financial annuity, realizing a taxable gain of $14,965. Exs. 213, 224. And she surrendered $60,000 of her Sun Life annuity. Ex. 224.

MEMORANDUM OF DECISION - 14

allowances" for the same, apparently referring to the $30,000 withdrawn in excess of the $400,000 needed for the purchase of the CWH investment.  Plaintiff testified that she was not told she would have to sell the annuities she bought in 2006 in order to fund the 2008 purchase.  She was not asked, and did not explain, where she thought the $400,000 would come from if not from her annuities. Ultimately, Plaintiff initialed and signed all the documents she was given by Debtor to withdraw the funds from her annuities.

### 3.    2010 charitable bargain installment sale

In May 2010, Debtor approached Plaintiff with yet another product, this one with Legacy Tree Foundation, a nonprofit group that offers what are known as "charitable bargain installment sales agreements."  This product provides a vehicle for philanthropic individuals to transfer an asset (here, an annuity) to a charitable organization (Legacy Tree) in return for a future income stream.  The seller gets a charitable tax deduction for the difference between the value of the asset transferred and the present value of the future payments.  While the future payments might constitute taxable income, a portion of the deduction might be used to offset that liability.

Now almost 89, and at Debtor's recommendation, Plaintiff agreed to transfer the remaining balance of her annuities valued at $400,409.40 to Legacy

MEMORANDUM OF DECISION - 15

Tree.[26]  In return, she would receive 15 annual payments of $28,944.47, though,

under the agreement, the commencement of those payments was deferred for five

years.  The payments would thus start when Plaintiff would be 94.  Once

commenced, those payments would be spread over a 15 year period (concluding

when she would be 109 years old).[27]  The tax deduction she received was

$167,928.31.  *See* Exs. 106, 107, 211, 223.

Debtor received a 7% commission (approximately $28,000) on the sale of

the Legacy Tree product.

### D.     Post-investment events

In April 2011, Plaintiff received a letter from CWH.  Ex. 102.  This letter

informed her that PCI, the "reinsurer" on the life settlement contract she purchased

in 2008, and its principals had been indicted for mail fraud and wire fraud, and

that such indictments created doubts as to whether PCI would be able to meet its

obligations under the contract.[28]  The letter further indicated that these events

created "substantial doubt" that PCI would perform its reinsurance obligations in

May 2014 if the insured had not died by that time, which would mean there would

---

[26]  As before, the change in investments had consequences.  Plaintiff received notice
from Allianz that the change of ownership of the annuity to Legacy Tree caused a taxable event
in 2010 of $33,450.54.  Ex. 226.

[27]  Debtor testified that shorter deferrals and quicker payouts were available, though such
modifications would alter the payment amounts and total payout.  *See*, *e.g.*, Ex. 216 (2011 letter
from Legacy Tree with alternatives).

[28]  Indeed, PCI and its principals either pled guilty to or were found guilty of many of the
offenses charged.  *See* Exs. 122, 123.

MEMORANDUM OF DECISION - 16

be no funds with which to pay her at that date.[29]

Plaintiff contacted Debtor upon receiving the CWH letter. She received less than satisfactory answers to her questions, and her relationship with Debtor quickly deteriorated. Plaintiff attempted to determine the nature and status of the life insurance policy involved in the CWH life settlement contract, but she was unsuccessful. Ex. 125.[30]

She also obtained the assistance of Ed McNellis, a friend of her late brother, who helped her reach an agreement with Legacy Tree under which it returned an Allianz annuity to her (at discounted value). Plaintiff then surrendered the same to Allianz, receiving $326,307.35. Ex. 225.

Plaintiff sued Debtor in state court in December 2011. That suit was stayed by Debtor's bankruptcy in March 2012.

## DISCUSSION AND DISPOSITION

A party seeking to except a debt from discharge under § 523 must prove its case by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279,

---

[29]   The letter did say, however, that premiums had been prepaid in amounts sufficient to keep the policy in force through 2025 and that, if the insured passed before that date, Plaintiff would be paid what the contract required. Of course, payment after May 2014 of the agreed benefit would dilute, perhaps significantly based on the date of the insured's passing, the return on investment. In practical terms, the lack of reinsurance makes the life settlement contract the problematic investment vehicle Server discussed, and one that would become "illiquid and open-ended because the investment's pay-out and return are dependent on the date of the insured's death." *See* Ex. 234 (S.E.C. press release re: charges against PCI).

[30]   This exhibit is a May 2011 response by Met Life addressed to one of the attorneys currently representing Plaintiff, responding to his inquiry about the policy.

MEMORANDUM OF DECISION - 17

291 (1991).  Generally, "exceptions to discharge are strictly construed against the objecting creditor and in favor of the debtor in order to effectuate the fundamental policy of providing debtors a fresh start." *Spokane Railway Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471, 475 n.5, 00.4 I.B.C.R. 199, 200 (Bankr. D. Idaho 2000) (citing *Snoke v. Riso (In re Riso)*, 978 F.2d 1151, 1154 (9th Cir. 1992)).  While a central purpose of bankruptcy is to allow an honest but unfortunate debtor a fresh start, "a dishonest debtor, on the other hand, will not benefit from his wrongdoing." *Apte v. Japra (In re Apte)*, 96 F.3d 1319, 1322 (9th Cir. 1996) (citing *Grogan v. Garner*, 498 U.S. at 286-87).

### A.    Section 523(a)(4)

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a fiduciary capacity."  Plaintiff correctly asserts, and Debtor does not effectively dispute, that Debtor was acting in a fiduciary capacity under <u>Idaho</u> law.  *See Beaudoin v. Davidson Trust Co.*, 263 P.3d 755, 759 (Idaho 2011) ("A fiduciary relationship exists when one party is 'under a duty to act or to give advice for the benefit of the other upon a matter within the scope of the relation.'").[31]

---

[31]  Further:

"[The] term fiduciary implies that one party is in a superior position to the other and that such a position enables him to exercise influence over one who reposes special trust and confidence in him. . . .  As a general rule, mere respect for another's judgment or trust in [his] character is usually not sufficient to establish such a

(continued...)

MEMORANDUM OF DECISION - 18

However, the general definition of "fiduciary" under nonbankruptcy law is inapplicable in the context of § 523(a)(4).  *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir. 2003); *Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 356 (9th Cir. BAP 2012); *Honkanen v. Hopper (In re Honkanen)*, 446 B.R. 373, 378 (9th Cir. BAP 2011).  To fall within the narrower definition of "fiduciary" applicable under § 523(a)(4), "the fiduciary relationship must be one arising from an express or technical trust that was imposed before, and without reference to, the wrongdoing that caused the debt" as opposed to a trust ex maleficio, constructively imposed because of the act of wrongdoing from which the debt arose.  *Cantrell*, 329 F.3d at 1125; *see also Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934).

The definition of fiduciary is thus governed by federal law, but the Ninth Circuit makes it clear that state law is to be consulted to ascertain whether the requisite express or technical trust relationship exists.  *Murray v. Woodman (In re Woodman)*, 451 B.R. 31, 39 (Bankr. D. Idaho 2011) (citing *Cantrell*, 329 F.3d at 1125; *Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir. 1996)).  To establish the trust relationship required by § 523(a)(4), the applicable state law

---

[31] (...continued)
relationship.  The facts and circumstances must indicate that the one reposing the trust has foundation for his belief that the one giving advice or presenting arguments is acting not in his own behalf, but in the interests of the other party."

*Id.* at 760 (quoting *Idaho First Nat'l Bank v. Bliss Valley Foods, Inc.*, 824 P.2d 841, 853 (Idaho 1991)).

MEMORANDUM OF DECISION - 19

must clearly define fiduciary duties and clearly identify trust property. *Honkanen*, 446 B.R. at 379 (citing *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756, 759 (9th Cir. 1981)). "The mere fact that state law puts two parties in a fiduciary-like relationship does not necessarily mean it is a fiduciary relationship within 11 U.S.C. § 523(a)(4)." *Id.*

Here, Debtor acted as a financial and investment advisor to Erma, and it is easy to understand why, after Erma died, Plaintiff sought Debtor's assistance in regard to her inheritance. It is absolutely clear from the evidence that Plaintiff trusted Debtor and relied on his advice as to every one of the several transactions addressed above. Thus, Debtor's relationship with Plaintiff falls within the Idaho definition of fiduciary. *Beaudoin*, *supra*. But that does not mean that a trust was created.

Under Idaho law, an express trust is created only if the settlor manifests an intention to create a trust.[32] This requires no particular words or conduct, and the settlor simply must evidence the intention, upon transferring property (the res) to the putative trustee, that the trustee will hold the same for the benefit of a third person, the beneficiary. *Keller v. Rogstad*, 733 P.2d 705, 709 (Idaho 1987); *Garner v. Andreasen*, 527 P.2d 1264, 1266 (Idaho 1974).

Here, there was no documentation reflecting or suggesting an express trust.

---

[32] Express trusts can be created either by agreement, or by statute. No argument is advanced that a statutory trust is here involved. The Court thus limits its discussion to express trusts created by agreement.

MEMORANDUM OF DECISION - 20

Nor was there a clearly defined trust res given by Plaintiff to Debtor to hold and

administer under trust for her benefit.  Debtor did not control Plaintiff's funds, nor

did he, as a trustee, make decisions for her benefit.  Though Debtor directed

Plaintiff's investments through his advice, the evidence does not establish that

Debtor is a "fiduciary" in the sense required by Ninth Circuit authority construing

and applying § 523(a)(4).[33]  Thus Plaintiff's § 523(a)(4) cause must be dismissed.

**B.      Section 523(a)(2)(A)**

Plaintiff also alleges fraud under § 523(a)(2).  To establish a debt is

nondischargeable for fraud under § 523(a)(2)(A), Plaintiff must prove five

elements by a preponderance of the evidence:

> (1) misrepresentation, fraudulent omission or deceptive conduct by the
> debtor; (2) knowledge of the falsity or deceptiveness of his statement
> or conduct; (3) an intent to deceive; (4) justifiable reliance by the
> creditor on the debtor's statement or conduct; and (5) damage to the
> creditor proximately caused by its reliance on the debtor's statement or
> conduct.

*Depue v. Cox (In re Cox)*, 462 B.R. 746, 756 (Bankr. D. Idaho 2011) (quoting

*Turtle Rock Meadows Homeowners Ass'n v. Slyman* (*In re Slyman*), 234 F.3d

---

[33]   It is clear under the current Ninth Circuit precedent, that a trust res is required.  While
the Court reviewed a 1988 Ninth Circuit Bankruptcy Appellate Panel decision addressing facts
similar to the case at hand but reaching the opposite conclusion, that case is irreconcilable with
the current, binding Ninth Circuit interpretation of fiduciary under § 523(a)(4).  *See Schneider v.
Davis (In re Schneider)*, 99 B.R. 974 (9th Cir. BAP 1988) (determining that even though a debtor
lacked physical control over a creditor's funds, he was still a fiduciary under § 523(a)(4) given
the control he had over the creditor and his direction of her investments as her minister,
counselor, therapist, lover and financial advisor).

MEMORANDUM OF DECISION - 21

1081, 1085 (9th Cir. 2000)).[34]

## 1.    False representation

While often an affirmative misrepresentation is involved, it is clear that an

action under § 523(a)(2)(A) can also be prosecuted on the basis of a concealment

or fraudulent omission of a material fact.  The BAP in *Stennis v. Davis (In re*

*Davis)*, 486 B.R. 182 (9th Cir. BAP 2013), noted that it is "well recognized that

silence, or the concealment of a material fact, can be the basis of a false impression

which creates a misrepresentation actionable under § 523(a)(2)(A)."  *Id.* at 191

(citing *In re Evans*, 181 B.R. 508, 514-15 (Bankr. S.D. Cal. 1995)).  "A debtor's

failure to disclose material facts constitutes a fraudulent omission under

§ 523(a)(2)(A) if the debtor was under a duty to disclose and possessed an intent to

deceive."  *Id.* (quoting *Haglund v. Daquila (In re Daquila)*, 2011 WL 3300197

(9th Cir. BAP Feb. 28, 2011)).  *See also Barnes v. Belice (In re Belice)*, 461 B.R.

564, 580 (9th Cir. BAP 2011); *Mandalay Resort Grp. v. Miller (In re Miller)*, 310

B.R. 185, 196 (Bankr. C.D. Cal. 2004) ("The concealment or omission of material

---

[34]   Initially, the Court observes that while Plaintiff failed to prove the requisite fiduciary
relationship under and for § 523(a)(4) purposes, she is not precluded from relying on the more
general definition of fiduciary in pursuing her § 523(a)(2)(A) claim.  *See In re Tallant v.
Kaufman (In re Tallant)*, 218 B.R. 58, 64 (9th Cir. BAP 1998) (relying on *Fowler Bros. v. Young
(In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996), determining that the subsections of § 523 are
generally not mutually exclusive and recognizing that, although a relationship might not satisfy
the elements of § 523(a)(4), a plaintiff is not precluded from relying on the more general
fiduciary relationship and duties associated with that relationship in pursuit of a § 523(a)(2)
claim).  *See also Stennis v. Davis (In re Davis)*, 486 B.R. 182, 191-93 (9th Cir. BAP 2013)
(finding that an "unlicensed financial advisor" was not a fiduciary for purposes of § 523(a)(4)
under Ninth Circuit authority, but that same debtor's failure to disclose (concealment) was
sufficient for § 523(a)(2)(A) purposes and issue preclusion was therefore applied).

MEMORANDUM OF DECISION - 22

facts that a party has a duty to disclose can support the nondischargeability of a debt on the grounds of actual fraud.").

Here, Plaintiff appears to concede there were no affirmative misrepresentations. Thus, under these authorities, she must establish (a) a duty to disclose and (b) an intent to deceive. The omissions, Plaintiff argues, include Debtor's failure to inform her of material facts regarding the investments, such as the details of the products he promoted to her, the risks involved in such products, and the lack of suitability of these investments for her situation.[35]

### a.    Duty to disclose

In *Field v. Mans*, 516 U.S. 59 (1995), the Supreme Court looked to the Restatement (Second) of Torts (hereafter "Restatement") to provide the applicable standard in analyzing § 523(a)(2)(A)'s exception from discharge for common law fraud. The common law of torts recognizes a duty to disclose in the following circumstances:

(1)  One who fails to disclose to another a fact that he knows may

---

[35]  These broadly encompass most of Plaintiff's nondisclosure arguments. In addition, Plaintiff points to a failure of Debtor to inform Plaintiff that the life settlement contract was a security under Idaho law, that the products could not be sold in Idaho because they were not registered, and that Debtor could not sell such products because he was not appropriately licensed. The Court considers these contentions only under the "totality of the circumstances," *see* discussion *infra*, and leaves for another forum the securities issues, either as they relate to § 523(a)(19) or under other Idaho statutes. Plaintiff also points to the fact that Debtor did not disclose how much he was making on commissions for the various products he encouraged Plaintiff to buy in 2006 and then again in 2008 and 2010. But Plaintiff testified that she assumed Debtor would get paid a commission, and that the amount was "none of her business." The Court therefore similarly considers the pursuit of commissions as part of the totality of the circumstances.

MEMORANDUM OF DECISION - 23

justifiably induce the other to act or refrain from acting in a business
transaction is subject to the same liability to the other as though he had
represented the nonexistence of the matter that he has failed to disclose,
if, but only if, he is under a duty to the other to exercise reasonable care
to disclose the matter in question.

(2)  One party to a business transaction is under a duty to exercise
reasonable care to disclose to the other before the transaction is
consummated,

    (a)  matters known to him that the other is entitled to know
because of a fiduciary or other similar relation of trust and confidence
between them; and

    (b)  matters known to him that he knows to be necessary to
prevent his partial or ambiguous statement of the facts from being
misleading; and

    (c)  subsequently acquired information that he knows will make
untrue or misleading a previous representation that when made was true
or believed to be so; and

    (d)  the falsity of a representation not made with the expectation
that it would be acted upon, if he subsequently learns that the other is
about to act in reliance upon it in a transaction with him; and

    (e)  facts basic to the transaction, if he knows that the other is
about to enter into it under a mistake as to them, and that the other,
because of the relationship between them, the customs of the trade or
other objective circumstances, would reasonably expect a disclosure of
those facts.

Restatement § 551.

The applicability of Restatement § 551 in § 523(a)(2)(A) actions is clear in

this Circuit.  *See Apte*, 96 F.3d at 1323-1324 (relying on Restatement § 551(2)(e)

for the debtor's duty to disclose a material fact, and stating "This [fact] was basic

MEMORANDUM OF DECISION - 24

to the transaction, and any reasonable person would expect its disclosure.").[36] *See*

*also Citibank v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir. 1996)

(referring to Restatement § 551 in considering whether a debtor is liable for

nondisclosure); *Tallant*, 218 B.R. at 65 (addressing nondisclosure of information

under § 523(A)(2)(a), and following *Apte* in applying Restatement § 551).[37]

    As found above, Debtor was in a fiduciary relationship with Plaintiff in the

general sense and definition of fiduciary (even if not in the more narrow sense

required for § 523(a)(4) purposes).  He was in a position of trust and confidence

and, thus, had a duty to "exercise reasonable care" to disclose his knowledge

regarding the nature and risks associated with the products he brought to Plaintiff

and recommended she purchase.  Restatement § 551(1) and (2)(a), (b), (e).  Thus

the requisite duty to disclose exists, but it exists only to the extent of Debtor's

knowledge.[38]

    Debtor counters that he provided Plaintiff with the information he did have,

---

[36] *Apte* also stated "a party to a business transaction has a duty to disclose when the other party is ignorant of material facts which he does not have an opportunity to discover."  *Id*.

[37] Idaho law is consistent in this regard.  *See Saint Alphonsus Reg'l Med. Ctr., Inc. v. Krueger*, 861 P.2d 71, 77-78 (Idaho Ct. App. 1992) (relying on Restatement § 551 and acknowledging that fraud may include a failure to disclose if a party owes a duty to another to disclose a fact, but finding no fiduciary relationship or duty to disclose in that case).

[38] The Restatement recognizes a duty only to the extent of disclosing information one knows.  It does not require Debtor to act in a professional manner nor to diligently investigate the products he sells in order to obtain the knowledge necessary to avoid negligence in the performance of his job.  *See* Restatement § 551.  As this Court noted in *Idaho v. Edwards (In re Edwards)*, 233 B.R. 461, 478-79 (Bankr. D. Idaho 1999), those who "*consciously* withheld important information . . . in order to entice customers to purchase" could be found to have fallen within § 523(a)(2)(A) for fraudulent omissions or failure to disclose.  *Id.* at *6 (emphasis added).

MEMORANDUM OF DECISION - 25

in the form of the applications and related disclosures.[39]  He also emphasizes that she voluntarily signed the same, arguing that she could have said no, and that her execution of the documents forecloses complaint.[40]

The Restatement notes, "the person under a duty of disclosure is not subject to liability merely because he has failed to bring the required information home to the person entitled to it.  His duty is to exercise reasonable care to do so.  If reasonable care is exercised, the fact that the information does not reach the person entitled to it does not subject him to liability."  Restatement § 551 cmt. d.  Here, Debtor provided Plaintiff with the disclosures associated with the CWH and Legacy Tree products, and gave Plaintiff the opportunity to read the same.  But, the evidence establishes that Debtor knew Plaintiff was neither reading and reviewing these materials, nor exercising any independent financial and investment judgment.  She was relying solely on him.  This impacts whether Debtor exercised "reasonable care" to provide Plaintiff with the information he knew, limited

---

[39]   Here, Debtor's knowledge and understanding regarding the CWH and Legacy Tree Products was limited.  He did little independent research and instead relied on AIS, CWH and Legacy Tree for the information he had.

[40]   Debtor here misses the point.  It is true that, in the context of contract law, "a party who signs an instrument manifests assent to it and may not later complain that he did not read the instrument or that he did not understand its contents."  *In re Wiebe*, 353 B.R. 906, 912 (Bankr. D. Idaho 2006) (quoting *Irwin Rogers Ins. Agency, Inc. v. Murphy*, 833 P.2d 128, 131 (Idaho Ct. App. 1992)).  But while such a concept operates in the context of contract enforcement, the present action is different.  The Plaintiff is not arguing that the contracts she signed are unenforceable.  Instead, she assumes the contracts are enforceable and seeks remedies against Debtor for his role in getting her into those contracts without disclosing material information in violation of his duties to her.

MEMORANDUM OF DECISION - 26

though it may have been.

### 2. Intent to deceive

*Nwas Oklahoma, Inc. v. Kraemer (In re Kraemer)*, 2011 WL 3300360 (9th

Cir. BAP Apr. 21, 2011), held:

> Because direct evidence of intent to deceive is rarely available, "the intent to deceive can be inferred from the totality of the circumstances, including reckless disregard for the truth." *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 167-68 (9th Cir. BAP 1999); *Household Credit Servs., Inc. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1145 n.4 (9th Cir. 1999) ("reckless conduct could be sufficient to establish fraudulent intent"); *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 656 (9th Cir. 1978) ("Reckless indifference to the actual facts, without examining the available source of knowledge which lay at hand, and with no reasonable ground to believe that it was in fact correct is sufficient to establish the knowledge element."). Thus a bankruptcy court may find the requisite intent "where there has been a pattern of falsity or from a debtor's reckless indifference to or disregard of the truth." *Khalil v. Developers Sur. and Indem. Co. (In re Khalil)*, 379 B.R. 163, 174-75 (9th Cir. BAP 2007) (discussing intent to deceive in the context of § 727(a)).

*Id.* at *5 (footnote omitted). But:

> [R]ecklessness alone does not equate to fraudulent intent; it is only probative of intent. *In re Khalil*, 379 B.R. at 174. "The essential point is that there must be something about the adduced facts and circumstances which suggests that the debtor intended to deceive" the creditor. *Id.* at 175. As the court noted in *In re McGuire*, the focus must be on "the totality of the circumstances and whether they create the overall impression of a deceitful debtor." 284 B.R. at 493.

*Id.* at *6. The Court must determine whether the evidence supports more than a

conclusion that Debtor was negligent; the Court must determine whether the

evidence establishes the presence of fraudulent or deceitful intent.

MEMORANDUM OF DECISION - 27

As the bankruptcy court in *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481,

492 (Bankr. D. Colo 2002), concluded:

> Deciding when misrepresentations cross the line from negligence to reckless disregard is an inherently subjective process. It is not a quantitative analysis, whereby twenty errors reflect negligence, but twenty-one errors reflect reckless disregard. The Court must always focus on the totality of the circumstances and whether they create the overall impression of a deceitful debtor.

*Id.* at 493. Looking at the totality of the circumstances, the Court must determine

upon which side of the line Debtor falls.

The Court may consider "the knowledge and relationship of the parties

themselves." *Tallant*, 218 B.R. at 67.[41] Here, Debtor was Plaintiff's financial

adviser and he represented to Plaintiff that these were appropriate investments for

her. However, he did so without a full understanding of the products. Debtor had

little knowledge beyond the items he actually read in the promotional materials he

received or gleaned from the application documents he provided to Plaintiff.

---

[41] While relevant to the totality of the circumstances, this is often an analysis performed in relation to the justifiable reliance standard. The justifiable reliance standard protects "the ignorant, gullible, and the dimwitted, for no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool, if a person does have special knowledge, experience and competence he may not be permitted to rely on representations that an ordinary person would properly accept." *Tallant*, 218 B.R. at 67 (quoting *Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)*, 973 F.2d 1454 (9th Cir. 1992)). To be clear, this Court does not find Plaintiff to be dimwitted, but she certainly was gullible in the sense of reflexively relying on what Debtor, as her financial advisor and consultant, recommended for her. Given the respective "knowledge" of the investment alternatives, risks and rewards, and the different access to information, and the respective degrees of experience she and Debtor had in this arena, and the "relationship" between them, Plaintiff's reliance was justifiable. Moreover, *Tallant* also recognized that in the Ninth Circuit, "'nondisclosure of a material fact in the face of a duty to disclose has been held to establish the requisite reliance and causation for actual fraud under the Bankruptcy Code.'" *Id.* at 67 (quoting *Apte*, 96 F.3d at 1323)).

Debtor relied on AIS for the product information and training.  It is clear he did

little independent research into the products he sold to Plaintiff.  And he sold her

products with little regard for her actual investment needs.

However, considering the totality of the circumstances, and even

recognizing Debtor's failures, the case is a close one.  The Court has wrestled with

the thorny issue of evaluating the presence of an intent to deceive from all the

evidence and with all inferences that fairly can be drawn therefrom.  In doing so, it

has reflected carefully on the testimony, and the circumstances in which Debtor

recommended and promoted, and Plaintiff purchased, these investments.  At

bottom, it concludes that the evidence clearly establishes professional negligence.

Plaintiff's lack of diligence and investigation was manifestly unprofessional.  But

the Court ultimately concludes the evidence does not tip over the line and show a

fraudulent intent to deceive.

To find the deceitful conduct required by the case law, the Court must

conclude, from this evidence, that Debtor knew or was aware of and intentionally

failed to disclose the inaptness of the investments and the risk to which Plaintiff

was exposed.  And since there was no other motive suggested, the Court must

conclude Debtor's intentional deceit was designed simply to generate serial

investments and, thus, commissions.

On the totality of the evidence, the Court cannot reach these conclusions as

to the transfer from Erma's annuities in 2006 to Plaintiff's new annuities.  There

MEMORANDUM OF DECISION - 29

were reasons for the change in annuities upon Erma's death.  While Debtor did

earn commissions, there is little else to suggest he failed to disclose known

material facts about those replacement annuities in order to gain Plaintiff's consent

to the investments.  It may have been a poor decision, but the evidence as a whole

does not suggest it was a knowingly deceitful one.[42]

The CWH investment in 2008 and the Legacy Tree transaction in 2010

present far tougher questions.  Debtor's commissions of approximately $20,000

(5% on the $400,000 CWH investment) and $28,000 (7% on the Legacy Tree

investment), were significant.  And significant too are Debtor's errors and

omissions – his professional negligence – in connection with the CWH/PCI and

Legacy Tree investments.

As discussed, Debtor was, and he knew he was, Plaintiff's sole financial

advisor and investment expert.  He knew her age and her financial circumstances.

These 2008 and 2010 investments were not appropriate and reasonable for Plaintiff

given those circumstances.  The rationale for shifting investments from the

annuities acquired after Erma's death to these products was never logically or

credibly explained.  And Debtor did not adequately convey the information he

---

[42]   The Court appreciates that there is an issue as to the "missing" $75,000.
Unfortunately, there are more questions – still – about this matter than there are answers.  No
evidence supports the conclusion that Debtor has, knows who has, or is responsible for this sum.
While he may be criticized, as Plaintiff's advisor and as the facilitator of this investment, for not
immediately noting the discrepancy and promptly taking action to find out the cause and
remediate it, that is not the same as concluding this is a loss born of fraudulent conduct or deceit.

MEMORANDUM OF DECISION - 30

knew regarding these investments.  Simply providing the product disclosures, which he knew Plaintiff had not read and did not appreciate, was insufficient to satisfy his duty to Plaintiff.

But violation of a duty must be coupled with an intent to deceive.  *See Davis*, 486 B.R. at 191 ("A debtor's failure to disclose material facts constitutes a fraudulent omission under § 523(a)(2)(A) if the debtor was under a duty to disclose *and possessed an intent to deceive*.").  There must be preponderating evidence of intent in order to obtain a judgment under § 523(a)(2)(A).  To preponderate, the evidence cannot be in equipoise.

As discussed above, under the Restatement, Debtor had a duty to disclose known information, but the Restatement does not address Debtor's professional duty to acquire information.  And the information Debtor actually held, but failed to adequately convey, suggests professional negligence as much as it suggests intentional fraud.  To be sure, the lure of high commissions was present.  But that Debtor was intentionally omitting known information in order to get Plaintiff's agreement to invest (and, thus, the commissions), was only one possibility and not one proven by a preponderance of the evidence.

To be clear, Debtor's behavior merits reproach.  He was thoughtless and uncaring.  He remained oblivious to facts and issues that a financial professional should have explored.  He acted as a salesman first and foremost, not as a financial consultant or advisor.  But, while worthy of criticism, his lack of knowledge and

MEMORANDUM OF DECISION - 31

lack of care are not equivalent to a failure to convey known facts with deceitful

intent.  To be sure, a reckless indifference or disregard of the truth may be

probative of intent, but it does not alone equate to fraudulent intent.  And the Court

concludes that the totality of the facts and circumstances proven at trial do not

preponderate in favor of finding Debtor intended to deceive Plaintiff.

Therefore, the Court finds the § 523(a)(2)(A) cause was not proven, and no

relief can be entered on it.[43]

**CONCLUSION**

Plaintiff has not established by a preponderance of the evidence each of the

requisite elements of § 523(a)(2)(A), and that cause must be dismissed.  Her action

---

[43]   This conclusion obviates the need to explore the proof of proximately caused damages
under § 523(a)(2)(A).  *See Harrison v. Ballew (In re Harrison)*, 2007 WL 7535080 at *7 (9th Cir.
BAP Mar. 29, 2007) (creditor must prove that he sustained the alleged loss as the proximate result
of the § 523(a)(2) representations); *Fetty v. Carlson (In re Carlson)*, 426 B.R. 840, 857 (Bankr.
D. Idaho 2010) (the debt that is nondischargeable must be directly traceable to the fraud; plaintiff
must show the specific money or property obtained by debtor through the fraud).

However, it may be noted that there are several issues in this regard.  Plaintiff seeks an
award not just in the amount of the surrender or early redemption charges suffered on disposing
of annuities, which amounts can be determined from the evidence.  Plaintiff also seeks recovery
of the commissions received by Debtor, an amount not adequately established at trial.  In
addition, Plaintiff seeks recovery of the $400,000 invested in the CWH product, though it appears
she still owns a 6.3186% interest in the MetLife policy.  Ex. 210.  That she has (at least yet) been
damaged in that amount is unclear.  She also seeks the "missing" $75,000, though the evidence
does not establish the details of this aspect of the transaction.  She seeks recovery of the "tax
impact" she suffered from the reported taxable gain in surrendering annuities.  Though the
reported taxable income is identified in the exhibits, the evidence is unclear on what the precise
damage from realizing receipt of that income actually was.  (Even Plaintiff's briefing, *see, e.g.*,
Doc. No. 25 at 25, Doc. No. 27 at 6, does not assert a firm figure but merely an estimate, and the
portions of the trial transcript cited as support do not establish the amount of a tax loss.)
Damages must, of course, be proven with specificity and cannot be speculative or conjectural.
*See Carlson*, 426 B.R. at 858 (discussing nature and calculation of damages); *Jensen v. White (In
re White)*, 363 B.R. 157, 164 (Bankr. D. Idaho 2007) (court cannot engage in conjecture as to
amount of damages).

MEMORANDUM OF DECISION - 32

under § 523(a)(4) must also be dismissed, based on a lack of proof of fiduciary status or capacity to the degree and extent required under controlling Ninth Circuit authority.  Judgment will therefore be entered for Debtor.[44]

Counsel for Debtor shall submit a proposed form of judgment consistent with this Decision.

DATED:  March 29, 2013

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE

---

[44]   While not pled in her complaint, Plaintiff's pre-trial and post-trial briefs argue for dismissal of Debtor's chapter 13 case based on bad faith under § 1307(c).  Debtor accurately notes that pursuit of such relief through this adversary proceeding is procedurally flawed.  The Court concludes that the issue of dismissal has not been properly presented, and that request will be denied, without prejudice.

MEMORANDUM OF DECISION - 33